Filed 9/14/15  In re Jessie B. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re Jessie B., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and Respondent, v. K.B., Defendant and Appellant. | F070623 (Kern Super. Ct. No. JD132138-00) **OPINION** |

-ooOoo-

**THE COURT**[*]

APPEAL from a judgment of the Superior Court of Kern County.  William D. Palmer, Judge.

Caitlin U. Christian, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Amanda LeBaron, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Kane, Acting P.J., Franson, J. and Smith, J.

At a dispositional hearing, the juvenile court ordered appellant K.B.'s daughter, Jessie B. (Jessie), removed from her custody. K.B. challenges the order on insufficiency of the evidence grounds. We affirm.

## FACTS

Jessie was born in October 2013. On November 12, 2013, the Kern County Department of Human Services (the "Department") received a referral from Los Angeles County alleging K.B. neglected Jessie. The referral indicated K.B.'s home had been very dirty and smelled of animal feces and urine. It also stated that K.B. had "anxiety disorder" and depression. The referral indicated that it was "suspected that K.B.'s [*sic*] Father Terry [B.] may have fathered [Jessie]…."

On December 18, 2013, social worker Stacy Fox ("Fox") spoke with K.B.'s mental health worker, Jeanette Shaw. Shaw said she had been to K.B.'s home the day before and saw that it was dirty, though Jessie herself was clean. K.B.'s father, Terry, told Shaw that he "has to make all of the decisions for [K.B.]."

On December 20, 2013, Fox went to K.B.'s home to investigate the allegations. Fox observed that the home had a strong odor and was filthy. Jessie was wearing only a diaper, which was full of urine. Two small, dirty dogs had "access to" Jessie. When Fox went upstairs, she observed "approximately twenty piles of dog feces on the upstairs carpet." The feces was in the bedroom where Jessie's crib and cradle were located.

Fox told K.B. the condition of the home was unacceptable. K.B. "acknowledged the problem … and started sweeping up the feces." Some of the feces could not be swept because it was dried to the carpet.

K.B. picked some of the feces up with her bare hands. Later, K.B. prepared a bottle for Jessie. Fox asked if K.B. had washed her hands. K.B. initially hesitated, then claimed that she had washed her hands.

During the visit, K.B. lifted Jessie without supporting her neck properly and then held her awkwardly while feeding her.

Fox thought K.B. "appear[ed] developmentally delayed." K.B. told the social worker she has "Aspergers," social anxiety and depression. She initially said she was on Atarax for her anxiety, but later said she was not taking any medication because she was breastfeeding.

Three days later, Fox returned to the home with a public health nurse named Wendy Jewett (Jewett). Jessie had a full, dirty diaper and wet clothing, but was otherwise clean. Jessie had a diaper rash, but K.B. said she had "no money to buy diaper rash cream." Jewett told K.B. that she needed to change Jessie's diaper more frequently.

Jewett examined Jessie and heard crackling in the upper lobes of her lungs. Jewett asked K.B. if Jessie had been coughing. K.B. said Jessie "has had a little cough for a couple days." Jewett explained that young infants can develop pneumonia or RSV quickly and that Jessie needed to see a doctor. K.B. responded that Jessie had no medical insurance. Jewett told K.B. to take Jessie to the doctor anyway. K.B. said she had no transportation. Jewett asked about using the bus system, to which Terry responded that "it was difficult to get a ride scheduled."

Jessie weighed nine pounds four ounces.

Jewett asked K.B. about Jessie's vaccination status. K.B. said that due to "a medical issue," Jessie had not been seen by a doctor since she was born. Jewett reiterated that Jessie needs to be seen by medical professionals.[1]

K.B. told Jewett that she suffers from "social anxiety" and had been taking Atarax before she became pregnant. However, she stopped taking it during pregnancy and breastfeeding. Jewett told K.B. to see her doctor so she could get on medication to enable her to meet the needs of her daughter. K.B. said she understood and that since Jessie was formula-fed, she could take her medication. Jewett concluded that it was

---

[1] Jewett followed up with a local health care provider and confirmed that Jessie was seen by a doctor on December 26, 2013. Jessie was vaccinated on January 2, 2014.

"clear" K.B. would benefit from therapy and other services such as those provided by Kern Regional Center.

Fox asked K.B. if her own father, Terry, was also Jessie's father. K.B. claimed he was not, and that a man named Robert Shaw was the father. However, later during the visit, Terry said that of all his children, Jessie "is the best."

On January 9, 2014, Jewett conducted an unscheduled visit to the home. The home was cluttered, but Jessie looked clean and healthy. Jewett spoke with Terry, who was "perturbed" by the fact that Jewett had told them Jessie was congested on a prior visit. Terry claimed they had taken Jessie to the doctor and the doctor was "angry" that Jewett had said the child was congested.

On January 22, 2014, Jewett and Fox agreed the public health nurse referral could be "closed" since K.B. had taken Jessie to the doctor and had gotten her vaccinated.

On January 28, 2014, Fox went to the home to discuss voluntary family maintenance services with K.B. Fox observed a truck in the driveway and heard the television on inside, but no one answered after she knocked several times. Similarly, on February 7, 2014, Fox saw a truck in the driveway and heard the television on inside but no one responded even though Fox called out K.B.'s name several times.

On February 11, 2014, Fox left a phone message with K.B. to schedule a meeting. Fox called again on February 12, 2014, but the phone "kept disconnecting."

On February 13, 2014, Fox went to the home and Terry answered the door. He was "very irritable." He claimed that K.B. was sick, had taken the bus to the hospital, and had taken Jessie with her. He did not know which hospital K.B. had gone to. Terry would not open the door fully, and Fox was concerned that K.B. and Jessie might have been inside. Fox told Terry she might have to have a welfare check performed by law enforcement, and he responded, "Do what you have to do."

4.

Later that same day, Fox returned to the home with a sheriff's deputy. The deputy observed the home was very dirty, but K.B. and Jessie were not home. Terry told the deputy he was planning to leave the home tomorrow and live in a homeless shelter.

Fox waited outside while the sheriff's deputy completed the welfare check. During that time, Fox was approached by a neighbor who said he had been in K.B.'s residence "two weeks ago" looking to purchase a refrigerator. The home was "disgusting" with dog feces on the floor, dirty dishes in the kitchen and dirty clothes all over the floor. The neighbor, who had grown up in foster care, said he thought the home was a danger to Jessie's health.

The neighbor also approached the sheriff's deputy and told him that Terry had said he would shoot anyone who came to take Jessie away from K.B. The sheriff's deputy told Fox not to return to the home without at least two sheriff's deputies accompanying her.

On February 14, 2014, K.B.'s mental health case manager, Jeannette Clowes (Clowes), told Fox that she had seen K.B. come into the clinic the prior day. K.B. seemed scared, looked "run down" and was coughing frequently. Jessie was dirty and "was crying [yet K.B.] would not pick her up." Clowes also conveyed that K.B. was refusing mental health treatment, including medication.

Clowes noted that she had seen Terry become irritated when Jessie cries, leading K.B. to take Jessie upstairs so "as to not upset" him. Clowes also observed that K.B. "is very rough" with Jessie. Clowes said that "the home is full of cigarette smoke."

On February 14, 2014, Fox went to the home with two sheriff's deputies and a public health nurse named Barbara Blaine (Blaine). Fox asked K.B. if she could come in and K.B. said no, because she needed to change Jessie's diaper. K.B. eventually let Fox and Blaine into the home. The home was "very dirty" with "trash of every kind strewn

5.

throughout the living room, dining room and kitchen." The carpet was soiled with "spills or urine spots." Fox asked K.B. why the home was so dirty. K.B. said she had been sick.

Fox asked if she could go upstairs, but K.B. refused. However, K.B. eventually relented, and they went upstairs. Fox observed multiple piles of dog feces in the room where Jessie's crib and cradle were located. There were six to eight dirty baby bottles laying around the room.

During the visit, Blaine had to tell K.B. to support Jessie's head five to six times.

Fox asked about the man K.B. claimed to be Jessie's father. Fox asked where they had conceived Jessie, and K.B. "just shrugged her shoulders" and did not answer the question.

K.B. admitted to hearing Fox come to the door on prior occasions, but claimed "she was changing the baby's diaper and could not get to the door."

K.B. claimed Terry did not live in the home. Fox asked Terry whether he lived in the home since he had been present "every time" Fox contacted K.B. Terry claimed he did not live in the home, but acknowledged he was "staying in the home currently because he is sick."

Terry said he believed Jessie was safe with K.B. Terry said he has 14 children from "many different mothers." Fox asked Terry if he was Jessie's father, and he said he was not.

Fox and Blaine noticed that Terry and K.B. smelled poorly, and Terry appeared to not have showered for "many days." Terry admitted to smoking in the home when K.B. and Jessie were not home.

Blaine assessed Jessie and determined that she was in the sixth percentile for weight and the fourth percentile for length. Blaine noted that Jessie's low weight was "alarming" and "may be secondary to the child not being fed properly." Blaine also concluded that K.B. had "significant emotional and mental health issues that perhaps

affect her … ability to care for" Jessie. Blaine expressed that she had the "utmost concern" for Jessie's "development, health and safety" while in K.B.'s care.

On February 19, 2014, Fox went to the home to serve a protective warrant, along with an intern and a sheriff's deputy. The sheriff's deputy searched Terry for weapons. The deputy asked Terry about the alleged prior statement claiming he would shoot anyone who tried to take Jessie. Terry said, "You're going to have to prove it."

The sheriff's deputy informed K.B. that they were going to take Jessie into protective custody. K.B. screamed, "No!" and ran back into the house and locked the door. The sheriff's deputy threatened to kick the door in. K.B. opened the door and tried to assault the sheriff's deputy. There was a physical struggle before K.B. ran back into the house. The sheriff's deputy prevented K.B. from closing the door and entered the home. K.B. yelled, "That fucking bitch lied to me" and "That bitch can't come in my house." Fox was not comfortable entering the home and remained outside. Jessie was taken into custody.

Fox observed that Jessie was "very dirty," had a "foul odor," and had dog hair in the folds of her neck. Fox also observed that Jessie's head appeared "flat" on the right side.

Jessie was taken into protective custory and placed in foster care. A Welfare and Institutions Code section 300 petition was filed later that day.

On February 20, 2014, the case was transferred to social worker Amy Blakslee (Blakslee).

On March 7, 2014, another social worker confirmed with K.B. that she had a mental health appointment on March 19, 2014. The social worker provided K.B. with a bus pass. The social worker also offered K.B. Regional Transit passes, but she said she did not need them.

Jacqueline Perez (Perez) was assigned as the new family services social worker on March 11, 2014. The next day, Perez submitted a referral to the Child Guidance Clinic's

7.

Time Limited Family Reunification Program on behalf of K.B. An intake appointment for K.B. was eventually scheduled for March 31, 2014. K.B. attended the intake appointment and was set to begin a series of parenting classes on April 22, 2014.

On March 14, 2014, Perez met with K.B. and told her about the referral to the Child Guidance Clinic. Perez also gave K.B. Kern Regional Center's telephone number and walk-in times. K.B. told Perez she was now taking her anxiety medication.

During a March 28, 2014, supervised visit, a human services aide observed K.B. supporting Jessie's head while she fed her.

On April 1, 2014, K.B. said she had received the information regarding Kern Regional Center but "was not interested in services through KRC." When asked why she was not interested, K.B. could not provide a reason.

On April 4, 2014 Perez provided K.B. a 31-day bus pass and eight Regional Transit daily passes. Perez again asked if K.B. had followed up with Kern Regional Center. K.B. said she had not. Perez offered to transport her to Kern Regional Center, and K.B. said she would "think about it" and let Perez know next week.

At a supervised visit on April 9, 2014, a human services aide noted that K.B. "appears to not have showered, due to body odor, and her clothing is dirty." When K.B. fed Jessie during the visit, she did not support her head. K.B. looked down at Jessie during her feeding and said, "Mama is just having a bad day today. Mama will be better next time. I'm sorry. Mama's having a bad day." Later, as K.B. began cleaning up the visitation room near the end of the appointment, she began to say aloud, "Mommy always does something wrong. Sorry Jessie. Mommy's bad. Mommy is wrong sometimes."

On April 14, 2014, the court sustained the petition and assumed jurisdiction over Jessie. K.B. was ordered to participate in a psychological evaluation.

On April 25, 2014, social worker Blakslee left K.B. a voicemail message reminding her of a scheduled psychological evaluation with a Dr. Thomas Middleton on May 19, 2014. The Department transported K.B. to the evaluation. After the evaluation,

Dr. Middleton prepared a report, which Blakslee received on May 27, 2014. The report indicated that K.B. "was … said to be sexually abused as a child." The report also noted that K.B. did not show evidence of intellectual impairment. However, personality testing indicated K.B. had "Schizoid Traits" consistent with her prior diagnoses of social anxiety and Asperger's Disorder. Dr. Middleton stated that K.B. "tends to be anxious, self-isolating, and mistrustful of others." Dr. Middleton indicated it was "unclear" whether K.B. would "be able to progress to the point that the child can be returned to her independent care within six months. She may require six to twelve months."

At a supervised visit on May 7, 2014, K.B. left Jessie on a couch to throw away a diaper. A human services aide quickly entered the visitation room and told K.B. that Jessie could easily roll off the couch and could not be left unattended.

On May 9, 2014, Perez gave K.B. Regional Transit passes and another 31-day bus pass.

On May 13, 2014, the Department received a report from the Child Guidance Clinic, which indicated that K.B. had attended all three parenting classes and was noted to have good participation.

On May 27, 2014, Blakslee contacted Kern County Mental Health and was informed that K.B. had been assigned to a therapist: Anne Pence.

On June 20, 2014, K.B. had a supervised visit with Jessie. Before the visit, Perez told K.B. that Jessie's care provider planned to take Jessie on a week-long trip. During the visit, K.B. "hardy spoke" to Jessie and "made minimal face-to-face contact."

On July 24, 2014, K.B. had another supervised visit with Jessie. K.B. spoke to Jessie throughout the visit and played with her. Perez noticed a strong foul odor when she entered the room to escort K.B. Perez said she wanted to check the condition of K.B.'s home and offered to give her a ride. K.B. said she had another appointment and left.

9.

On July 23, 2014, Perez made a second request to Child Guidance Clinic for K.B. to receive guided visitation services.

On June 4, 2015, Perez gave K.B. another 31-day bus pass and eight Regional Transit passes.

K.B. began seeing Dr. Komal Desai with Kern County Mental Health.[2] Dr. Desai prescribed Citalopram to K.B.

K.B. failed to attend mental health services appointments with Kern County Mental Health on May 2, 2014 and May 7, 2014. On May 13, 2014, Kern County Mental Health left a message for K.B. to schedule a therapy appointment but had not heard from her as of June 25, 2014.

On July 23, 2014, Kern County Mental Health told Blakslee that it "would not be able to provide an update on any details of [K.B.'s] treatment," and as a result, the court might not receive the information it needed to make decisions in Jessie's case. Kern County Mental Health recommended that K.B. go to Child Guidance Clinic for mental health services.

On July 23, 2014, Blakslee and Perez made an unannounced visit to K.B.'s home. Terry was outside doing yard work. He again claimed he did not live with K.B. He also claimed that K.B. was not home, that he did not know where she was or when she would return. Blakslee thanked him and told him to let K.B. know the social worker had come to see her.

On July 25, 2014, Perez went to K.B.'s home to evaluate its condition. While Perez parked, she observed K.B. close the door to a camper trailer, then go inside the home and shut the door. Terry came outside and told Perez that she would not find the home in the best condition. He also told Perez that the camper trailer was his.

---

[2] It is not clear when K.B. began seeing Dr. Desai. Perez informed Blakslee that K.B. was seeing Dr. Desai on June 16, 2014.

10.

As Perez approached the house, there was a "penetrating" smell. There were bags and boxes of trash in the front yard. There were also pieces of furniture, appliances and other "parts" in the yard. Perez entered the house where there were "numerous flies." There was a stain on the floor, and the kitchen needed to be swept and mopped. Perez asked to see Jessie's room. While K.B. escorted her upstairs, Perez noticed nails on the stairwell. Jessie's room, however, was clean and had appropriate items for a baby (e.g., crib, dresser).

Terry blamed the state of the house on Perez, because one of K.B.'s supervised visits with Jessie had been rescheduled. Perez told Terry that the visit had been rescheduled because Jessie had a medical appointment.

On August 8, 2014, Blakslee reiterated to K.B. that she should go to mental health counseling. K.B. said that lack of transportation may be a hindrance due to a bus strike.

On August 11, 2014, K.B. had a supervised visit with Jessie. K.B. played with Jessie and prevented her from touching an electrical socket.

Child Guidance Clinic contacted K.B. on August 5, 2014, to schedule an intake appointment. K.B. told Child Guidance Clinic that she could not make it because of the bus strike. Perez scheduled another intake appointment for August 20, 2014, and transported K.B. to the appointment.

On September 12, 2014, Perez reviewed the case plan with K.B. K.B. said she had completed her parenting/neglect classes and has "visit coaching" on Wednesdays. K.B. said she sees a therapist and psychiatrist through Kern County Mental Health.

Before a scheduled, supervised visit on September 26, 2014, Perez met with K.B. K.B. was exuding "a strong penetrating odor that filled the … lobby." K.B.'s hair was tangled, uncombed and unwashed.

As of October 13, 2014, K.B. had attended all her scheduled appointments with her therapist and psychiatrist and was taking her medication. K.B.'s therapist said K.B. initially blamed others for her circumstances but had recently begun to verbalize her own

responsibility. K.B. told the therapist she has someone coming into her home to teach her about cleaning and organizing. According to Blakslee's notes, the therapist "had no concerns at this time."

On October 13, 2014, Perez and Blakslee made an unannounced visit to K.B.'s home. The front of the home was clear of debris and clutter. Another yard area enclosed by a gate had small pieces of wood, glass, and various hardware tools and objects. There was also a work station with pieces of wood and tools, along with a large piece of white cardboard and a yellow colored liquid.

Again, Terry was at the home, but denied living there. Terry was asked to get K.B., to which he responded, "You've come at the wrong time." Terry told K.B. to come out, but K.B. said she was on the phone and would be out soon. After approximately five minutes, K.B. came outside.

The home had a "foul odor." There were small pieces of paper and trash scattered on the floor. On the floor there was "what appeared to be a brassiere that had what looked to be fecal matter on it." There were food particles and dirt scattered on the kitchen floor.

K.B. claimed that no one was coming to her home to help her clean and denied saying anything to that effect to her therapist.

There was dog feces in Jessie's room that had hardened and been flattened into the carpet. Blakslee conveyed to K.B. that she realized how important her pets were to her and then asked if she had considered keeping them outside if she cannot stop them from defecating in the house. K.B.'s face became flush and she raised her voice. K.B. said she was "very upset." She walked towards Blakslee and yelled, "And I'm about to throw you out of this house." Blakslee told K.B. she was leaving and then exited the home with Perez. K.B. followed Perez and Blakslee out of the door, yelling that she did not trust them.

12.

On October 15, 2014, Child Guidance provided a progress report, which indicated that K.B.'s level of participation was "good" with no areas of concern.

A contested dispositional hearing was held on October 22, 2014. The Department submitted on the social workers' reports. K.B. argued that she was in compliance with her case plan and that there were services available which could assist her "under [a] plan of family maintenance."

The court found there was "clear and convincing evidence that there is a substantial danger to the physical health, safety, protection or physical or emotional well-being of the child or there would be if the … child is not removed from the parent, and there is no reasonable means to protect the child's physical health without removal of the child from the physical custody of the mother." K.B. appeals.

## DISCUSSION

K.B. argues the court's dispositional order continuing the removal of Jessie was not supported by sufficient evidence.

### I. Substantial Evidence Supporting the Juvenile Court's Dispositional Order Removing Jessie from K.B.'s Custody

"At the dispositional hearing, the court must decide where the child will live while under the court's supervision. [Citation.]" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 145.) Before a court may order removal at the dispositional stage, "it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. [Citations.]" (*Id*. at pp. 145–146; § 361, subd. (c)(1).) On appeal, we review a dispositional order removing a child for substantial evidence. (*In re Hailey T.*, *supra*, 212 Cal.App.4th at p. 146.)

Here, there was substantial evidence that Jessie faced a substantial risk of harm if returned home. Jessie was found living in a home with dog feces littered throughout. Months later, Jessie's weight was in the sixth percentile, and her height was in the fourth

13.

percentile. The public health nurse described the rapid weight loss as "alarming" and possibly caused by failing to feed Jessie properly.

A week before the court ordered removal, K.B.'s home was again found to have feces inside that had been hardened and flattened into the carper. When social workers made suggestions on how K.B. could alleviate the unsanitary condition, K.B. yelled at them and chased them out of her home.

These conditions warranted removal.

K.B. relies on *In re Paul E.* (1995) 39 Cal.App.4th 996 in arguing that "[c]hronic messiness is not sufficient" to warrant removal. We agree that a cluttered or messy home does not necessarily warrant removal. But, like many things, the cleanliness of a home is a matter of degrees. When a home becomes so filthy that it creates unsanitary conditions which present a "substantial danger to the physical health … of the minor" (Welf. & Inst. Code, § 361, subd. (c)(1)), then removal at the dispositional hearing may be appropriate. Even *Paul E.*'s holding recognizes this reality. That case unremarkably held that "chronic messiness by itself *and apart from any unsanitary conditions* or resulting illness or accident, is just not *clear and convincing* evidence of a substantial risk of harm. [Citation.]" (*In re Paul E.*, *supra*, 39 Cal.App.4th at p. 1005, first italics added, second italics in original.) But here, there were unsanitary conditions caused by animal feces, flies, and cigarette smoke throughout the home. Under the facts of this case, it was reasonable for the juvenile court to conclude that the condition of the home posed a substantial danger to Jessie's health.[3]

---

[3] Moreover, K.B. showed instability with respect to her mental health. Though she made commendable progress in some aspects of her case plan, she also failed to attend several appointments in May 2014. There was substantial evidence that mere days before the dispositional hearing, K.B. yelled at two social workers and chased them out of her home for suggesting she leave her animals outside.

*II. K.B. has Failed to Show on Appeal that there was Insufficient Evidence Supporting the Juvenile Court's Finding that there were no Reasonable Means to Protect Jessie Short of Removal*

In addition to finding a substantial danger, the court must also find "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's … physical custody" before ordering removal. (Welf. & Inst. Code, § 361, subd. (c)(1).)

K.B. argues there was insufficient evidence to support such a finding. She argues that the Department did not consider any services to help her improve the condition the home. The record supports a contrary conclusion. The Department noted at the dispositional hearing that Kern Regional Center provides services regarding housekeeping, preparing meals, etc. The record also shows that on March 14, 2014, Perez had met with K.B. and provided her information regarding Kern Regional Center. However, on April 1, 2014, K.B. said that although she had received the information regarding Kern Regional Center, she "was not interested in services through KRC." When asked why she was not interested, K.B. could not provide a reason. The juvenile court could have reasonably concluded that ordering services K.B. refused would not have resolved the issues.

K.B. also argues the juvenile court " 'could have returned Jessie to her mother … with the warning that if she again let her house get filthy or failed to keep Jessie in clean clothes and properly care for her' that K.B. *would* lose custody." But K.B. had been told to clean up her home on several occasions. When the Department first became involved, the social worker told K.B. the condition of the home was unacceptable. Yet, one week before the court ordered removal, animal feces was still found inside the home. On this record, the juvenile court could have reasonably concluded that K.B. would not have availed herself of yet another chance to keep the home clean.

The record before us does not support K.B.'s substantial evidence challenge.

## DISPOSITION

The judgment is affirmed.